UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLIFFORD OWHOR,

       Plaintiff,

v.                                    Case No. 09-11257

PROVIDENCE HOSPITAL AND           HONORABLE AVERN COHN
MEDICAL CENTERS, INC.,

       Defendant.

_____/


## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## (Doc. No. 36)
## AND
## DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED
## COMPLAINT
## (Doc. No. 52)
## AND DISMISSING CASE

I.  Introduction

      This is an employment discrimination case.  Plaintiff Clifford Owhor ("Owhor")

claims that his former employer, Providence Hospital and Medical Centers, Inc.

("Providence") discriminated against him based on his race and national origin when he

was terminated from his employment as a Physician's Assistant ("PA") for sleeping

during a surgery.  The discrimination claims are based on theories of disparate

treatment and hostile work environment under state and federal law.  Plaintiff also

asserts a state law defamation claim.

Before the Court is Providence's motion for summary judgment. Also before the Court is Owhor's motion for leave to file a second amended complaint to add a retaliation claim. For the reasons that follow, Providence's motion will be granted and Owhor's motion will be denied. This case will be dismissed.

## II. Background

The material facts as gleaned from the parties' papers follow.[1]

Owhor was born in Nigeria. He came to the United States at the age of 22 and became a United States citizen in 1993. He considers himself African-American.

From 2002 to 2007, Owhor worked as a PA at St. John's Health - Detroit Riverview Hospital. When Riverview Hospital was closed in 2007, Owhor was recruited by Mary Legette ("Legette") at Providence, another hospital in St. John's Health System. He interviewed with Legette, Linda Eckstein ("Eckstein"), Dr. Lawrence Cheung ("Dr. Cheung"), the Chief of Surgery, and Dr. Vijay Mittal. Owhor was hired to begin working in July 2007. Owhor's job description was PA - specialty surgery.[2]

Owhor was jointly supervised by Eckstein and Nora Bass ("Bass"). Bass generally oversaw the work of employees on the floors, while Eckstein generally supervised the Operating Room ("OR"). Vicki Jacobs ("Jacobs") served as the OR manager and reported to Eckstein. Bass and Eckstein reported to John O'Malley.

---

[1]The facts relate to Owhor's discrimination claims. Facts related to his defamation claim will be discussed infra in analyzing that claim.

[2]Although licensed and working as a PA, Owhor' s education includes a B.S. in pre-medicine from Northern Kentucky University in 1981, a B.S. as a PA from Western Michigan University in 1984, an M.D. as a general practitioner from Chihuahua, Mexico in 1987, and Master's of Science in biology from the University of Detroit Mercy in 1992.

At the time of his hire, Owhor and Taneisha Franklin ("Franklin") were the only general surgery PA's at Providence. Franklin is also African-American.

At the start of his employment, Owhor worked in the mornings at Providence's "Greenfield Road Building" (a.k.a. "Pavillion One") and conducted patient histories and physical examinations ("H and Ps"). In the afternoons, he would travel to the main Hospital where he would work in the OR or conduct pre-operative H and Ps.

About a month after his hire, in August of 2007, Legette asked Owhor how things were going. He responded, "are we here to do [histories and physicals only]? Legette responded that "it will get better." Owhor raised no other concerns at that time. Apparently, however, Owhor wanted to spend more time in the OR.

In September of 2007, Owhor attended a meeting where Dr. Cheung expressed his desire to improve the surgery department and the use of PA's. The changes Dr. Cheung requested were prompted by the fact that several fifth-year resident physicians recently ended their rotations at other hospitals. Dr. Cheung explained that PA's would work with medical residents on the patient floors. Owhor described the meeting to Legette and did not tell her that anything was wrong. After this meeting, Owhor's duties remained the same except he no longer went to Pavillion One in the mornings. He also began to participate in more surgeries.

At some point, apparently beginning in September of 2007, Owhor began to receive what he believed to be unfair treatment from Dr. Cheung. This included Dr. Cheung telling Owhor he could not eat any food brought in from pharmaceutical representatives. Owhor says that in late September or early October, after Dr. Cheung saw Owhor with food from a pharmaceutical representative, Dr. Cheung went into his

office and slammed the door behind him.

In October of 2007, Owhor attended another meeting with Dr. Cheung and others. It resulted in no further changes to Owhor's job duties. In response to Legette asking Owhor how things were going, he said "fine." He made no complaints.

On November 18, 2007, another meeting with Dr. Cheung took place. This was a large meeting with Owhor, Franklin, their co-supervisor Bass, and nurse practitioners in attendance. Dr. Cheung made a presentation about the respective roles of the mid-level providers, like PA's, and surgical residents. In Owhor's view, the duties Dr. Cheung described that were expected of PA's were more along the lines of nurse practitioners. When Owhor asked what duties were expected of PA's, Dr. Cheung replied "I hate you in scrubs! I hate you in scrubs! I hate you in scrubs!" Dr. Cheung also apparently told Owhor that he was forbidden to go into the surgeon's lounge, the attending lounge and that he should perform 80% floor work and 20% surgery. Dr. Cheung also told Owhor he would be fired if he was found in the forbidden locations.

Bass, who was present at the November meeting, spoke to Dr. Cheung. Bass told Dr. Cheung that his statements to Owhor were "inappropriate" and that he should leave floor management issues to her "meaning that whatever supervision was taking place relative to the floor care of patients was going to actually take place through me." Dr. Cheung agreed to do so. Bass also told Owhor that she did not think Dr. Cheung's statements were appropriate and recommended that Owhor not speak to Dr. Cheung without her being in attendance.

Owhor reported Dr. Cheung's treatment of him at the meeting to Legette. He told Legette he felt humiliated and cried because of Dr. Cheung's statements to him. Owhor

also apparently told Legette he did not know if Dr. Cheung spoke to him that was because Dr. Cheung did not like him or if it was because "he is black or both." Legette testified at deposition that she believed Owhor was raising the issue of race, which she took seriously, but that Owhor did not want her to act on it yet. She further testified that Legette believed that Owhor was "confiding in" her and sharing the information. Legette also testified that she shared her "concern" with Bass and to Bologna. At deposition, Legette describes reporting the incident in terms of raising a "concern" brought to her in "confidence" and that it could be "held against us from a racial standpoint." Legette further testified that she did not know if Bologna conducted any further investigation.

It is undisputed that after the November meeting, Owhor had no further contact with Dr. Cheung. He also said he continued to wear scrubs and was not disciplined for it. As to where he went in the hospital, Owhor says that he went to the surgical lounge, not the surgeon's lounge, as well as a lounge in the basement used by the nurse practitioners. He also went to a research area used by residents and used the computer there. Owhor admitted that no PA's ever used the surgeon's lounge.

Owhor raised no other concerns with Legette after November 2007.

On January 18, 2008, Owhor had his six month performance review with Eckstein and Bass. He was given an overall "satisfactory" evaluation. He was also provided detailed comments which were overall favorable.

Owhor, however, says Bass and Eckstein verbally told him at the evaluation that he needed to arrive at 7:00am not 6:00am[3] and check in the with "board runner" to

---

[3]Owhor had been arriving early apparently to go on rounds with the residents.

check the OR needs and get assignment. He was also leaving at 2:00pm or 2:30pm which left gaps in patient coverage and was reminded he may have patient responsibilities past 3:00pm. Indeed, Eckstein's notes from the evaluation show that an incident on January 11, 2008 was discussed where Owhor was paged at approximately 2:55pm to cover an emergency. This was after Owhor was told he would be required to cover the OR if residents were not available. He did not answer the page and had apparently left the hospital. Owhor explained his absence was because he was upset because he was asked to cover the OR, but then sent to the floor "and he did not understand why [Eckstein] did not want him to be in the OR and it was discrimination." Eckstein's notes also say that Owhor "appeared angry that he was not allowed to cover the cases but was asked to do orders." Also discussed at the evaluation were the places where Owhor could go during downtime and that Providence was looking for space for him, presumably to have a desk.

Owhor believes that the "restrictions" like having to check in at 7:00 and where he could go during downtime were "discriminatory."

On January 18, 2008, Franklin resigned her employment at Providence. She testified at deposition that she believed Providence had a racially hostile environment under Bass and Eckstein.

In late February or early March 2008, Eckstein received a verbal report from a Surgical Technician, Noreen Dillon ("Dillon"), that Owhor appeared to be sleeping during surgery. Eckstein instructed Dillon to inform her if it ever happened again.

On March 11, 2008, Vicki Jacobs ("Jacobs"), the OR Manager, was asked to enter the OR where Dr. Michael Mendelow was performing orthopedic surgery on a

pediatric patient.  Owhor was assisting Dr. Mendelow and was standing on a stool holding a retractor.  Jacobs entered the OR after Lorraine Taube ("Taube"), the circulating nurse, reported to Jacobs that Owhor was sleeping.  Jacobs observed Owhor.  She testified at deposition that his eyes were closed and that the upper half of his body was swaying back and forth and he was "nodding."  Jacobs also testified that Owhor did not respond when his name was called.

In addition to Jacobs, three other persons present in the OR saw Owhor with his eyes closed and appeared to be sleeping.  They are:  Greg O'Dell, a Certified Nurse Anesthetist; Denice Fryer, a Surgical Technologist; and Tonya Howard ("Howard"), a Registered Nurse.  Dr. Mendelow, however, stated that he was focused on the surgery and did not observe Owhor or otherwise know whether he was sleeping.

Owhor testified that he was not sleeping and he recalled someone calling out his name during the surgery, that he asked why they were calling his name, and someone responded to him to take a break, step down, and step backwards.

Jacobs reported the incident to Eckstein, who reported it to Worklife Services (Providence's Human Resources Department).  Colleen Kretzschmar, a Worklife Services, told Jacobs to send Owhor to Occupational Health for an examination to ensure he was not having a medical emergency.

Owhor reported to Occupational Health where he was physically examined and given a drug and alcohol screen.  His physical examination was essentially normal.  Initial drug tests were also normal, however, the expanded drug screen took several days to complete.  Owhor was apparently sent home.

On March 18, 2009, Owhor reported to Dr. Vosburge, the Corporate Medical

Director, who concluded that Owhor was medically fit to return to work.  Bass, however,

informed Owhor that he could not return because an investigation into the March 11

incident was still pending.

Providence's Corrective Action Policy states in relevant part:

3.      In determining the appropriate level of corrective action, factors which may
        be considered are: the circumstances of the violation, the nature and
        severity of the violation, length of service within SJH and the associate's
        history of corrective action
4. . . in cases of major violations, management is required to contact Worklife
Services for assistance in establishing a plan of action, which may include
immediate suspension and/or discharge of an associate
 . . .
Major Violations - Major violations are acts of misconduct or unacceptable
behaviors of a serious nature.  Violations of this type may result in suspension
and/or discharge.
. . .
MAJOR VIOLATIONS
16.     Major violations are defined below are not intended to be all-inclusive and
        the severity of the corrective action may vary according to the
        circumstance of the offense.  Generally, once an investigation has been
        completed, the corrective action for major violations will be a suspension
        and/or discharge from employment.  SJH reserves the right to immediately
        suspend or discharge associates for acts that are not listed here.
        X.      Sleeping or the appearance of sleeping during work hourse, or
                sleeping or the appearance of sleeping in unauthorized areas at
                any time, including meal periods or rest breaks.

Eckstein, in accordance with the Corrective Action policy consulted with Worklife

Services regarding the March 11 incident.  On March 25, 2008, Owhor was terminated

for sleeping during surgery.  The Corrective Action report shows that Owhor met with

Eckstein, Bass, and Patty Thorton of Worklife Services.  The report shows the situation

was discussed with him and it was explained that sleeping, or the appearance of

sleeping was a major violation and that doing so during a surgery could jeopardize

patient safety.  At the end of the meeting, Owhor stated he "knew he was going to leave

but that he was not going alone and would take others with him." Owhor refused to sign the report.

Owhor sued Providence making the following claims:

I. Race and National Origin discrimination under Title VII
II. Race and National Origin Hostile Work Environment under Title VII
III. Race and National Origin Discrimination under Elliot Larsen
IV. Race and National Origin Hostile Work Environment under Elliot Larsen
V. Defamation

### III. Providence's Motion for Summary Judgment

#### A. Legal Standard

Under Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In addition, where a moving party seeks an award of summary judgment in its favor on an issue as to which it bears the burden of proof, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir.1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. Pack v. Damon Corp., 434 F.3d 810, 813

9

(6th Cir.2006). However, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must-by affidavits or as otherwise provided in [Rule 56]-set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, all affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." <u>Pack</u>, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

B.  Analysis

1.  Race and National Origin Discrimination under Title VII and Elliot Larsen

a.

In Counts I. and III., Owhor claims that Providence terminated him because of his race and national origin. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from discriminating against an employee because of the employee's race or national origin. The Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2302(a), reads in pertinent part as follows:

Except where permitted by law, a person shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex or marital status.

The Act "is aimed at the prejudices and biases borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." <u>Radtke v. Everett</u>, 442 Mich. 368

10

(1993) (citation omitted).

b.

Owhor says he has produced direct evidence of discrimination based on his testimony and that of Franklin, who both believe that they were treated differently because of their race.  He also cites deposition testimony of non African-American PA's, which will be discussed in more detail below, who stated that they did not believe they were treated differently.  None of this is direct evidence.  The Sixth Circuit has explained the difference between direct and circumstantial evidence of discrimination as follows:

> Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir.1999).  Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred.

Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).

Owhor's subjective belief that he was discriminated against is not direct evidence.  If it were, then every discrimination case would be considered a direct evidence case.  Likewise, Franklin's belief that she was discriminated against is also not direct evidence nor are statements from non African-American PA's direct evidence of discrimination.  See DeBiasi v. Charter County of Wayne, 537 F. Supp. 2d 903, 923 (E.D. Mich. 2008) ("It is well-settled that opinions expressed by co-workers who have no direct involvement in the decision-making processes have no probative value as to the employer's alleged discriminatory intent.").  Moreover, Owhor admits that while he believes Dr. Cheung singled him out, he does not know if it was because of his race or because Dr. Cheung did not like him.  Indeed, there are no direct statements by Dr.

Cheung, or any of Owhor's supervisors, which requires a conclusion that Owhor was terminated because of his race or national origin. Thus, if Owhor is to succeed on his claims of race and national origin discrimination, he must do so by providing circumstantial evidence.

c.

For a claim based on circumstantial evidence under Title VII and Elliot-Larsen, the burden-shifting framework articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) applies. <u>See</u> <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 391 (6th Cir. 2008) (applying <u>McDonnell Douglas</u> to claims under Title VII and Elliot-Larsen; <u>Lind v. City of Battle Creek</u>, 470 Mich. 230, 681 N.W.2d 334, 338 (2004) (confirming that the <u>McDonnell Douglas</u> test for a prima facie case applies to claims brought under Elliot-Larsen).

Under this framework, Owhor has the initial "not onerous" burden of establishing a prima facie case of discrimination by a preponderance of the evidence. <u>Burdine</u>, 450 U.S. at 253. To establish a prima facie case of employment discrimination, Owhor must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. <u>Arendale v. City of Memphis</u>, 519 F.3d 587, 603 (6th Cir. 2008); <u>see also</u> <u>Hazle v. Ford Motor Co.</u>, 464 Mich. 456, 628 N.W.2d 515, 521 (Mich. 2001); <u>Lytle v. Malady</u>, 458 Mich. 153, 579 N.W.2d 906, 914 & n. 19 (Mich.1998) (describing the fourth part of the prima facie case as requiring the plaintiff to show that he "was discharged under circumstances that give rise to an inference of unlawful

discrimination," but explaining that "[t]his four part test is an adaptation of the United States Supreme Court's <u>McDonnell Douglas</u> test to prove a prima facie case of discrimination").

Once Owhor establishes a prima facie case, the burden shifts to Providence to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. <u>Burdine</u>, 450 U.S. at 253; <u>McDonnell Douglas</u>, 411 U.S. at 802. Finally, if Providence succeeds in this task, the burden shifts back to Owhor to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. <u>Burdine</u>, 450 U.S. at 253; <u>see</u> <u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078, 1083 (6th Cir.1994) ("[O]nce the employer has come forward with a nondiscriminatory reason for [its actions] the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."). Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. <u>See</u> <u>Burdine</u>, 450 U.S. at 256.

Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id</u>. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. <u>See</u> <u>Imwalle v. Reliance Med. Prods., Inc.</u>, 515 F.3d 531, 545 (6th Cir.2008) (citing Manzer, 29 F.3d at 1084). However, the plaintiff may also demonstrate pretext by offering evidence which challenges the

reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 578 (6th Cir.2003) (en banc); see also Burdine, 450 U.S. at 259, 101 S.Ct. 1089 ("The fact that a court may think that the employer misjudged the qualifications of applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." (emphasis added)); Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n. 6 (1st Cir.1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one.").

d.

Here, Providence says that Owhor cannot make out a prima facie case because the record fails to show he was treated differently than a similarly-situated non African-American and/or non-Nigerian.[4]  The Court agrees.

When explaining the "similarly situated" portion of the prima facie case, the Sixth

---

[4]Providence also argues that Owhor suffered only one adverse employment action - his termination.  The Court agrees.  An adverse employment action requires a "materially adverse change in the terms or conditions of employment."  See Mitchell v. Toledo Hospital, 389 F.3d 177, 182 (6th Cir. 2004).  To the extent Owhor says that being told not to go to certain areas of the hospital, report to work at 7:00am as scheduled, instead of 6:00am, to avoid leaving before his shift was up at 3:00pm, check with the board runner, or by being told by Dr. Cheung not to eat pharmacy representatives' food, are adverse actions, this argument fails.  None of these acts resulted in a change of salary, benefits, title or work hours; therefore, they are not adverse.  See Flynn v. Oakland County, 2009 WL 2046133 (E.D. Mich. 2009).  Moreover, clearly Owhor's undisputed overall successful January 2008 performance evaluation does not constitute an adverse employment action.

Circuit has held:

> [I]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated <u>in all respects</u> .... [T]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated"; rather the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the <u>relevant</u> aspects." ... [T]his Court has asserted that in applying the standard that plaintiff must show that he is treated differently than similarly situated employees from outside the class courts should not demand exact correlation, but should instead seek relevant similarity.

<u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605, 610-11 (6th Cir.2002) (internal citations, quotation marks, and alterations omitted) (emphasis in original); see also <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir.1998) (internal citations and quotation marks omitted) ("To be deemed 'similarly-situated' in the disciplinary context, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").

Here, it is undisputed that Providence has terminated other employees for sleeping or appearing to sleep. While Owhor makes much of the fact that the majority of those terminated for this misconduct were African-American, he has not identified any similarly situated non African-American and/or non Nigerian who was found to have been sleeping, or appearing to sleep, and was not terminated. Indeed, the record shows that termination for this conduct was the norm, not the exception. Bologna, for example, testified that in her 22 years are Director of Worklife Services, she could not recall anyone who was not terminated for sleeping, or appearing to sleep, while on the

job.

Owhor identifies Roger Ong, an Asian-American PA, who testified that he spent 30 to 40% of his time in surgery whereas Dr. Cheung told Owhor he was to spend 20% of his time spent in surgery. However, at the relevant time, 2007, Ong was no longer in general surgery and no longer worked with Dr. Cheung. Owhor also testified that the changes in fifth year residents' status that prompted the transition of work performed by PA's in 2007. Thus, Ong is not similarly situated.

Owhor also compares his treatment to Donald Lilak, a Caucasian PA. Lilak was hired in August 2008, about five months after Owhor was terminated. Lilak worked part-time at Providence for 1 month, and split his time with Providence Park hospital in Novi. Lilak eventually began full-time employment in Novi. While Owhor says he was "replaced" by Lilak, the record shows otherwise. The brief, part-time tenure of Lilak at the same Providence hospital Owhor worked at before he transitioned to full-time employment at a different Providence hospital location, does not mean Lilak "replaced" Owhor.

Moreover, Owhor's argument that no other PA's were required to "punch in" and "punch out" does not show discriminatory treatment. Owhor did not say he was required to punch in and punch out; rather Eckstein and Bass told him to report to work at 7:00am, not 6:00am, and to check the runner board for where he was needed to avoid gaps in patient coverage.

Finally, Owhor says that Dillon[5] is similarly situated. Dillon was one of the people

---

[5]Tonya Howard also testified she had seen Owhor sleeping during surgery, once leaning on a patient.

in the OR who said they saw Owhor sleeping during the surgery, and who also said she had previously seen him sleeping several other times. Owhor says Dillon was not disciplined for failing to report him sleeping on those prior instances. This comparison is inapt. While Eckstein admitted that Dillon violated Providence policies by not previously reporting Owhor sleeping, there is a distinct difference between not reporting seeing someone sleeping and actually sleeping, or appearing to sleep. Thus, Dillon did not engage in the same conduct as Owhor.

Overall, there is nothing in the record to show that Owhor was treated any differently than a non-protected person who was reported to be sleeping, or appearing to sleep, during surgery or otherwise on the job. As such, Owhor has not made out a prima facie case of race or national origin discrimination.

Even if Owhor had made out a prima facie case, he cannot show that the reason for his termination was pretextual. That Owhor denied he was sleeping is not material. He appeared to Jacobs and three others in the OR to be sleeping. An employers' honest belief, even if incorrect, is not pretext. See Majewski v. Auto. Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001). Likewise, the fact that Dr. Mendelow did not see him sleeping during the surgery that day and the fact that other physicians testified they did not observe Owhor sleeping during other surgeries he assisted in, is immaterial. Providence had the observations of Jacobs and statements from others present in the OR, all of whom expressed the opinion that Owhor was sleeping. Moreover, it is undisputed that Dr. Cheung, whom Owhor appears to claim as the source of the discriminatory treatment, was not involved in the decision to terminate him.

17

Providence is therefore entitled to summary judgment on Owhor's race and national origin discrimination claims based on disparate treatment.

2. Race and National Origin - Hostile Work Environment

In Counts II. and IV., Owhor claims he was subjected to a hostile work environment because of his race and national origin. To successfully claim a hostile work environment, Owhor must prove the following elements: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment based on his race; (3) such harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of Providence. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir.1999); Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834 (6th Cir.1996).

To evaluate the third prong-whether the harassment was sufficiently severe to create an intimidating, hostile, or offensive work environment-the court should consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). Courts must examine the totality of the circumstances. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Under this test, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether-taken together-the reported incidents make out such a case." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir.1999). The harassment against Owhor must be "so severe or pervasive as to alter the conditions of the victim's employment," and must be subjectively and objectively

18

offensive.  <u>Faragher</u>, 524 U.S. at 786-87.  "Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee," or "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are insufficient to constitute unlawful harassment.  <u>Id</u>.

Here, there is insufficient evidence that Owhor was subjected to unwelcome harassment because of his race or national origin.  Owhor testified that neither Bass nor Eckstein ever referred to his race or nationality.  There is also no evidence that Dr. Cheung referred to Owhor's race or national origin.  Owhor admits he had no contact with Dr. Cheung after November 2007.  Moreover, Owhor's complaints of being told not to wear scrubs, not going into certain areas, arriving at the time his shift started, and various other "criticisms" noted above simply do not constitute a severe or pervasive hostile work environment, particularly where the record is devoid of any indication that these facts, which are at best workplace indignities, were in any way related to Owhor's race or national origin.

Moreover, while Owhor appears to argue that Providence mishandled his complaints about Dr. Cheung, and therefore can be found liable, the record shows otherwise.  While Eckstein and Bass were concerned about Dr. Cheung's statements to Owhor, Bass took prompt action by telling Dr. Cheung to leave management issues to her.  While Owhor told Bass and Eckstein he believed he was being discriminated against, he also did not lodge any kind of formal complaint.  Owhor himself stated that he was not sure whether Dr. Cheung's treatment was because he simply did not like him.  Summary judgment on Owhor's discrimination claims based on hostile work environment is appropriate.

19

3.  Defamation

a.

In Count V., Owhor claims defamation.  Owhor says that after his termination, he believed he had a position at another hospital - Oakwood - but that someone at Providence told Oakwood not to hire him because he was fired for poor performance.

Owhor had apparently applied at Oakwood Hospital before he began working at Providence.  After his termination, Owhor renewed discussions with Michael Waines ("Waines") from Oakwood.  Waines later told Owhor that "[i]t was recommended to me that we not hire you because you left your previous place of employment on less than favorable circumstances, okay?"  Waines testified at deposition that he was relying on information he got from Matthew Jakovac ("Jakovac"), another Oakwood employee. Jakovac testified at deposition that he got information about Owhor from Sandy Wolford ("Wolford'), whom he described as a boss and a friend.  Wolford had previously worked at Providence in Eckstein's position and now worked at Oakwood.  When Jakovac asked Wolford whether he could recommend Owhor, she apparently replied she would not recommended him.  Jakovac further testified that Wolford did not tell him why nor did she tell him she had talked to someone from Providence.  Wolford is now deceased.


Bass testified that someone from Oakwood Hospital called her about Owhor. She told then she could not give a reference and directed them to contact human resources.

b.

The elements of a defamation claim are: (1) a false and defamatory statement

20

concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. Mitan v. Campbell, 474 Mich. 21, 24; 706 NW2d 420 (2005). Additionally, [a] communication is defamatory if, considering all the circumstances, it tends to so harm the reputation of an individual as to lower that individual's reputation in the community or deter third persons from associating or dealing with that individual. Kevorkian v. American Medical Association, 237 Mich. App 1, 5; 602 NW2d 233 (1999).

The first problem with Owhor's defamation claim is that is rests on hearsay and the alleged defamer - Wolford - is deceased. His claim is based on what Wolford told Jakovac who in turn relayed that to Waines. Owhor cannot rely on hearsay to establish a genuine issue of material fact. See Sperle v. Michigan Dep't of Corrections, 297 F.3d 483, 495 (6th Cir.2002) (citation omitted). Because Owhor has offered no other evidence of the defamatory statements, summary judgment for Providence is proper.

Secondly, Owhor has not established that Providence made any false representations about him. Jakovac testified he learned from Wolford that she would not recommend Owhor. He also testified that Wolford did not explain the reason for her not recommending him. Jakovac also testified he got the impression that Wolford was drawing upon her own experience with Owhor and not on any information she may have received from anyone at Providence.

IV.  Owhor's Motion for Leave to Amend Complaint

Owhor seeks leave to amend his complaint to add a retaliation claim under Elliot-

Larsen.  Providence objects on the grounds that it is untimely, prejudicial, and amendment would be futile.

A.  Legal Standard

Under Fed. R. Civ. P. 15(a), a party may amend their pleadings after 20 days "only by leave of court or by written consent of the adverse party; and leave to amend pleadings "shall be freely given when justice so requires."  The decision whether or not to permit the amendment is committed to the discretion of the trial court.  See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-32 (1971); Estes v. Kentucky Util. Co., 636 F.2d 1131, 1133 (6th Cir. 1980).  This discretion, however, is "limited by Fed.R.Civ.P. 15(a)'s liberal policy of permitting amendments to ensure the determination of claims on their merits."  See Marks v. Shell Oil Co., 830 F.2d 68, 69 (6th Cir. 1987) (citation omitted).  In determining whether to permit amendment, some of the factors which may be considered by the district court are undue "delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment."  Hageman v. Signal L.P. Gas, Inc. 486 F.2d 479, 484 (6th Cir. 1973).  See also Foman v. Davis, 371 U.S. 178, 182 (1962).  Delay by itself is not sufficient to deny a motion to amend.  Hageman, 486 F.2d at 484.  See also General Elec. Co. v. Sargent & Lundy 916 F.2d 1119, 1130 (6th Cir. 1990).  Moreover, in denying a motion to amend, a court must find "at least some significant showing of prejudice to the opponent."  Moore v. City of Paducah, 790 F.2d 557, 562 (6th Cir. 1986).

Here, Providence argues in part that amendment is improper because it would be

futile. A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss. Thiokol Corp. v. Department of Treasury, State of Michigan, Revenue Div., 987 F.2d 376, 382-83 (6th Cir. 1993). Thus, it is appropriate to set forth the standard for a Rule 12(b)(6) motion. A Rule 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001). To survive a motion to dismiss under Rule 12(b)(6), a "'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)). "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, ___ U.S. ___, ___; 127 S. Ct. 1955, 1974 (2007). "[E]ven though a complaint need not contain "detailed" factual allegations, its factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Assn. of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007), citing Twombly (internal citations and quotation marks omitted).

B. Analysis

Putting aside Providence's arguments as to timeliness, the question becomes

23

whether the amendment would be futile. Elliot-Larsen prohibits a person from retaliating against another for engaging in an activity protected by the act. M.C.L. § 37.2701(a) provides, in relevant part, that "a person shall not ... [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has ... filed a complaint...." To make a prima facie showing of retaliation, a plaintiff must show:  (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. DeFlaviis v. Lord & Taylor, Inc., 223 Mich. App. 432, 436 (1997).  As to the causal connection element, Owhor must show that his participation in a protected activity was a "significant factor" in his termination, not just that there was a causal link between the two. Barrett v. Kirkland Comm. College, 245 Mich. App. 306, 315 (2001).

Owhor says that he can make out a retaliation claim because the record shows he raised the issue of discrimination with Bass and Eckstein during his review and they did not follow up on it and he was terminated two months later.  As described above, however, Owhor did not make a formal complaint of discrimination, other than saying during his review that he believed he was being "discriminated" against.  There is nothing in the record to show that his termination was in any way related to his vague statement about being discriminated against, much less a motivating factor.  There is no grounds for amendment.

## V.  Conclusion

As explained above, a careful review of the record establishes that there is no

genuine issue of material fact that Owhor was terminated in accordance with Providence's policy regarding sleeping, and not because of his race or national origin. None of the actions he complains of during his employment, including his termination, were related to his race or national origin. Put simply, Owhor has not made out a case for race or national origin discrimination.

Providence's motion for summary judgment is GRANTED. Owhor's motion to amend is DENIED.

This case is DISMISSED.

SO ORDERED.


Dated: August 4, 2010          _S/Avern Cohn_____
                               AVERN COHN
                               UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 4, 2010, by electronic and/or ordinary mail.

                               _S/Julie Owens_____
                               Case Manager, (313) 234-5160